**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 48636**

| | | |
|---|---|---|
| KEITH HOOD and KAREN HOOD, husband and wife, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| | ) | Boise, May 2022 Term |
| v. | ) ) | |
| | ) | Opinion filed:  October 27, 2022 |
| PAUL POORMAN and GAYLE POORMAN, husband and wife; and RUSTY ANDERSON, an individual, | ) ) ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendants-Respondents. | ) ) | |
| | ) | |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Washington County. Susan E. Wiebe, District Judge.

The district court's decision is <u>affirmed in part</u>, <u>reversed in part</u> and <u>remanded</u>.

Parson Behle & Latimer, Boise, for Appellants. Norman M. Semanko argued.

Givens Pursley, LLP, Boise, and Bokides Law Office, Weiser, for Respondents. Michael P. Lawrence argued.

_____

ZAHN, Justice.

This case concerns a district court's decision defining the scope of a ditch right-of-way under Idaho Code section 42-1102 and enjoining the ditch users from certain activities within the right-of-way. For the reasons stated below, we affirm in part, reverse in part, and remand.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

1. <u>Background of the properties.</u>

In 2012, Karen and Keith Hood purchased real property in Washington County, near Cambridge, Idaho. The Hoods' property is near Gayle and Paul Poormans' property, which the

Poormans purchased in 2006 and 2008. Rusty Anderson owns a smaller property that borders the Poormans' property to the South. He has lived on the property since 2003 and owned it since 2006.

The Hoods' property has three decreed appurtenant water rights. One water right is a groundwater right for domestic and stock use unrelated to this appeal. The other two water rights concern surface waters designated for irrigation and stock use. The Hoods' surface water rights total 2.93 cubic feet per second. Water from these rights is diverted from Rush Creek and conveyed to the Hoods' property through an irrigation ditch ("the Hood ditch"). The crux of this case involves that portion of the Hood ditch which runs through the Poormans' property and Anderson's property. The Hood ditch is approximately four miles long and generally runs in a southwesterly direction from its point of diversion to the Hoods' property. The channel of the ditch is approximately two feet wide, and the ditch is roughly two feet deep and up to six feet across from bank to bank. Slightly more than a mile of the Hood ditch runs through the Poormans' property. The Hoods' point of diversion from Rush Creek is also on the Poormans' property. Approximately 500 feet of the Hood ditch crosses Anderson's property. The Hood ditch traverses varied topography, with much of its course on the Poormans' property cut into the side of a hill and the portion on Anderson's property crossing relatively flat land. In addition, two natural drainages intersect the Hood ditch on the Poormans' property. A narrow access road parallels the Hood ditch through the Poormans' property. The Hoods' predecessor in interest had historically used the access road when maintaining the ditch. The Poormans and Anderson provided the following map on appeal as an illustrative exhibit depicting the parties' properties and course of the Hood ditch:



**Figure 1, Illustrative Map of the Hood Ditch and Affected Properties.**

2. <u>Conflicts between the Hoods and Poormans/Anderson.</u>

In 2014, the Hoods removed a small bridge that Anderson had installed over the ditch. Anderson had constructed the bridge in 2010 to access five acres of his property with vehicles and other equipment.

In March 2016, the Hoods removed two culverts (the "north culvert" and the "south culvert") from the ditch on the Poormans' property. Because the Hood ditch splits the Poorman property in two, the Poormans used those culverts for vehicular access to roughly 200 acres of their property on the west side of the Hood ditch. The north culvert had been in place since at least 2006 and the south culvert had been in place since around 2003.

In 2017, the tensions between the Hoods and the Poormans/Anderson escalated. The Hoods and Poormans had several verbal altercations where the Hoods expressed their view that the ditch right-of-way granted them exclusive ownership and absolute control of the area surrounding the ditch. At times the Hoods expressed their view that their right-of-way was 200 feet wide, and they could do "whatever [they] wanted" in that area. The Hoods also objected to Paul Poorman walking in the ditch and spraying noxious weeds near it. As the animosity between the parties increased, the Hoods took hundreds of photos and videos of the Poorman and Anderson properties. The photos and videos showed the Hoods accessing portions of the Poorman property hundreds of feet away from the Hood ditch, sometimes without maintenance tools or any apparent ditch-related purpose. The Poormans encountered the Hoods on the access road on several occasions. Further, the Hoods cut trees and dug trenches along the access road.

Following an altercation with Paul Poorman in July 2017, the Hoods began clearing trees and other vegetation on the Poormans' property, claiming the practice was necessary to maintain the ditch. All told, the Hoods removed approximately 100 trees, many of which had been planted by the Poormans. The trees ranged in distance from the Hood ditch, with some as close as eighteen feet and others nearly 165 feet away from the ditch. The Hoods planted several of the removed trees in pots on their own property. In addition to removing trees, the Hoods also used a bulldozer to scrape approximately two acres of the Poormans' property down to bare earth in the area between the access road and the Hood ditch.

Finally, in the autumn of 2019, Paul Poorman filled in a portion of the Hood ditch with dirt, near where the south culvert had been removed, so that he could access his property on the

4

opposite side of the Hood ditch with a vehicle. In addition, Anderson temporarily reinstalled a bridge over the Hood ditch in the spring of 2020 to access his property and make fence repairs.

**B. Procedural History**

The Hoods filed a complaint on November 6, 2019, seeking to have the district court: (1) enjoin the Poormans and Anderson from interfering with their maintenance of the Hood ditch right-of-way; (2) declare the Hoods' rights with respect to the right-of-way; and (3) award damages against the Poormans and Anderson for damage done to the Hood ditch right-of way. The Poormans and Anderson filed answers and counterclaims on December 9, 2019. Anderson's counterclaim asserted three causes of action: (1) interference with property rights; (2) declaratory relief; and (3) injunctive relief. The Poormans' counterclaim raised five causes of action: (1) civil trespass; (2) declaratory relief; (3) injunctive relief; (4) statutory liability under Idaho Code sections 42-1102 and 42-1204; and (5) negligent, willful, or intentional interference with property rights.

Pertinent to this appeal, both the Poormans' and Anderson's prayers for declaratory relief requested the district court define the Hoods' rights to access and maintain the Hood ditch. Anderson sought to have the Hoods reinstall the bridge over the ditch on Anderson's property. The Poormans asked the district court to require the Hoods to replace the removed culverts on the Poormans' property, and refrain from removing trees and other vegetation outside the scope of the Hood ditch right-of-way. The Poormans also requested monetary compensation for damage to their property as a result of the Hoods' ditch maintenance, including the removal of trees and vegetation.

The Hoods moved for partial summary judgment, asking for the district court to conclude that (1) the Hoods owned three water rights, (2) the Hoods owned the Hood ditch, (3) the Hoods possessed a right-of-way for the Hood ditch, (4) the Hoods held statutory rights in the right-of-way under Idaho Code section 42-1102, and (5) that the Poormans and Anderson could not interfere with those statutory rights without prior written permission. The Poormans and Anderson did not contest that the Hoods were entitled to partial summary judgment on the above issues but requested that the district court add qualifications to its judgment on certain issues. They did not contest the Hoods' claims that they owned three water rights and they enjoyed statutory rights under section 42-1102. However, on the other issues, they requested the district court to enter summary judgment as follows:

5

- "Hood owns the Hood ditch, which is a non-exclusive ditch easement across the Defendants property for diversion and conveyance of the water under the Hood Water Rights";
- "Hood has a right-of-way across Defendants' Properties, along with the obligations of a ditch holder, in accordance with applicable statute and applicable case law"; and
- "Defendants shall not place encroachments in the right of way that materially or unreasonably interfere with the right of way without Hood's written permission."

Following oral argument, the district court issued a written decision granting the Hoods' motion for partial summary judgment that incorporated the limitations proposed by the Poormans and Anderson.

The district court held a four-day bench trial on the remaining issues in June 2020. On September 21, 2020, the district court issued its written decision, which we summarize below.

1. The Hoods' access to the right-of-way.

The district court found that the Hoods had unreasonably exercised their right to use the right-of-way and that the access road on the Poormans' property did not provide direct access to the right-of-way. The district court then found that the Hoods could reasonably access the right-of-way by only traveling along the ditch banks. The district court identified a reasonable point of access to the right-of-way from the south, which relied primarily on use of the ditch banks and permitted use of the access road when obstacles interfered with access to the ditch banks. The district court found that the Hoods could reasonably access their weir[1] from the ditch bank, and that from the weir they could reasonably access their point of diversion by using the Poormans' access road. Alternatively, the district court found that the Hoods could reasonably access the right-of-way from the north by using a road through an adjacent property owned by a nonparty. The district court also found that if the Hoods established a ditch bank from their weir to their point of diversion, they could use that bank for reasonable access. Finally, the district court enjoined the Hoods from accessing the right-of-way from any point other than the access points described in its order.

---

[1] The Hood ditch uses a Cipolletti weir, which is a device installed in a ditch to calculate the rate at which water flows through the ditch.

2. <u>The frequency, timing and notice governing the Hoods accessing the right-of-way.</u>

The district court found that the Hoods accessed their right-of-way more than the typical practice for ditch users in the surrounding area. The district court again applied Idaho Code section 42-1102 and reasoned that the statute did not allow the Hoods to access their right-of-way at any time to clean, maintain, or repair the ditch. Rather, the district court ruled that the Hoods' access and maintenance rights were limited by the "rule of reasonableness." Applying that standard to the above facts, the district court concluded that the Hoods' prior use of the right-of-way had been unreasonable and that "the excessive access may [have been] intended, in part, to harass." Given what the district court found to be excessive and unreasonable use of the right-of-way, the district court concluded that irreparable harm to the Poormans' and Anderson's properties would occur unless the Hoods' use of the right-of-way was restricted. Accordingly, the district court limited how often and when the Hoods could access the right-of-way.

3. <u>The Hoods' removal of culverts in the right-of-way.</u>

The district court found that the Hood ditch ran through three culverts on the Poormans' property—the north culvert, the south culvert, and a culvert beneath the Poormans' driveway. The district court found that, after using the culverts for four years, the Hoods removed both the north and south culverts in March 2016 without prior notice to the Poormans. The district court also found that the Hoods intended to remove the culvert beneath the Poormans' driveway in the future, despite never having observed that culvert interfering with the ditch's flow. Without the north and south culverts, the district court found that more than 200 acres of the Poormans' property was accessible only by foot.

The district court found that neither of the culverts had restricted the flow of water in the Hood ditch. The district court concluded that the Hoods' actions in removing both culverts unreasonably increased the burden on the servient estate by cutting off access to 200 acres of the Poormans' property and causing the Hoods to build new roads on the Poormans' property to access the ditch. Accordingly, the district court concluded that the Poormans were entitled to damages for the cost of reinstalling the culverts. Further, the district court enjoined the Hoods from removing the culvert beneath the Poormans' driveway, reasoning that the Hoods had not carried their burden to demonstrate that the culvert unreasonably or materially interfered with their right-of-way.

7

4. <u>Findings of fact and conclusions of law regarding damages.</u>

The district court found in favor of the Poormans on their negligence counterclaim, which alleged that the Hoods breached their duties under Idaho Code sections 42-1102 and 42-1204 to properly clean, maintain, and repair the ditch. The district court reiterated its findings that the Hoods had acted outside the scope of their statutory right-of-way and negligently maintained the ditch, causing an increase in rodent activity, noxious weed growth, increased leakage from the ditch, flooding from the Hood ditch, difficulty accessing portions of the Poorman property, the creation of additional roads outside the right of way, and damage to the natural habitat. Consequently, the district court awarded the Poormans monetary damages including $1800 for replacing the north and south culvert, $250 for the removal of a mature apple tree, and $300 for additional weed spraying measures.[2]

The district court subsequently entered a judgment consistent with its written decision. The Poormans and Anderson filed a motion to alter or amend the judgment, requesting that the district court attach the deeds to the dominant and servient estates and add language stating that the terms of the judgment shall run with the parties' lands. Subsequently, on December 29, 2020, the district court entered an amended judgment. The amended judgment attached the deeds to the dominant and servient estates, removed subheadings in the judgment related to declaratory relief, injunctive relief, and damages and stated that the determination of the parties' rights and obligations related to the use of the right-of-way "shall run with the parties' lands and shall be binding upon their respective successors in interest." The Hoods timely appealed.

## II.    ISSUES ON APPEAL

1. Did the district court err in defining and limiting the scope of the Hoods' rights to access and maintain their ditch right-of-way?

2. Did the district court err in determining the Hoods had improperly removed the north and south culverts?

3. Did the district court err in its damage award to the Poormans?

## III.    STANDARD OF REVIEW

The Hoods have not raised any issues on appeal concerning the grant of partial summary judgment below. Instead, their appeal focuses on the district court's judgment following the bench

---

[2] The district court also awarded the Poormans $11,960 in damages to restore the natural habitat on their property and $275 in damages for wire baskets and wood stakes taken by the Hoods. However, the Hoods have not challenged these damages on appeal.

trial. As such, this Court's review of the district court's decision "is limited to determining whether the evidence supports the findings of fact and whether the findings of fact support the conclusions of law." *Burns Concrete, Inc. v. Teton Cnty.*, 168 Idaho 442, 456, 483 P.3d 985, 999 (2020). Factual findings will not be set aside unless they are clearly erroneous. *Caldwell Land & Cattle LLC v. Johnson Thermal Sys., Inc.*, 165 Idaho 787, 795, 452 P.3d 809, 817 (2019). A factual finding is clearly erroneous if it is not supported by substantial and competent evidence. *Id.* Although there may be conflicting evidence, "[s]ubstantial and competent evidence exists '[i]f there is evidence in the record that a reasonable trier of fact could accept and rely upon in making the factual finding challenged on appeal.'" *Id.* (second alteration in original).

This Court "is not bound by the legal conclusions of the trial court" and exercises free review to "draw its own conclusions from the facts presented." *Morgan v. New Sweden Irr. Dist.*, 160 Idaho 47, 51, 368 P.3d 990, 994 (2016) (citing *U.S. Bank Nat'l Ass'n N.D. v. CitiMortgage, Inc.*, 157 Idaho 446, 451, 337 P.3d 605, 610 (2014)) (internal quotation marks omitted). However, this Court liberally construes a trial court's factual findings in favor of the judgment entered. *Caldwell Land & Cattle*, 165 Idaho at 795, 452 P.3d at 817. This Court also exercises free review over questions of statutory interpretation. *D.A.F. v. Lieteau*, 166 Idaho 124, 126–27, 456 P.3d 193, 195–96 (2019).

Finally, "[t]he granting or refusal of an injunction is a matter resting largely in the trial court's discretion." *Munden v. Bannock Cnty.*, __ Idaho __, 504 P.3d 354, 363 (2022) (citing *Conley v. Whittlesey*, 133 Idaho 265, 273, 985, P.2d 1127, 1135 (1999)). Accordingly, this Court applies an abuse of discretion standard to a decision to grant injunctive relief, asking "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

## IV. ANALYSIS

### A. The district court's decision limiting the Hoods' exercise of their secondary easement rights is affirmed in part and reversed in part.

This case requires us to address the scope of a ditch user's rights under Idaho Code section 42-1102 and what relief is available when a ditch user acts unreasonably in the exercise of those statutory rights. Thus, we must interpret the statute to determine whether the district court erred in

concluding that the Hoods acted outside their statutory rights and whether the district court properly granted injunctive relief to the Poormans and Anderson.

The goal of statutory interpretation is to give effect to "the intent of the legislative body that adopted the act." *Melton v. Alt*, 163 Idaho 158, 162, 408 P.3d 913, 917 (2018). To that end, our analysis begins with the statute's literal language. *Id.* We read the statute as a whole, giving words their plain, usual, and ordinary meanings. *Id.* "[W]here a statute is unambiguous, its plain language controls and this Court will not engage in statutory construction." *Ravenscroft v. Boise Cnty.*, 154 Idaho 613, 615–16, 301 P.3d 271, 273–74 (2013).

All parties to this action agree that section 42-1102 creates an easement—referred to as a right-of-way—for a ditch user. Generally stated, an easement is "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose." *Easement*, BLACK'S LAW DICTIONARY (11th ed. 2019). A right-of-way is a specific type of easement, which gives "[t]he right to pass through property owned by another." *Right-of-way*, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, the plain language of section 42-1102 creates a right-of-way for a landowner to convey water over the land of another for irrigation purposes, through use of a ditch, canal, or conduit.

In our decisions addressing section 42-1102, we have consistently used the term "easement" to generally describe the right-of-way conferred by the statute, and have applied longstanding principles of easement law to that statutory right-of-way. *See Morgan v. New Sweden Irr. Dist.*, 156 Idaho 247, 253, 322 P.3d 980, 986 (2014); *Nampa & Meridian Irr. Dist. v. Wash. Fed. Sav.*, 135 Idaho 518, 522, 20 P.3d 702, 706 (2001). "[T]his Court assumes the Legislature has full knowledge of . . . existing judicial interpretation when it amends a statute." *Robison v. Bateman-Hall, Inc.*, 139 Idaho 207, 212, 76 P.3d 951, 956 (2003). Accordingly, where "terms and phrases have developed a specific meaning or subtext resulting from years of consistent judicial interpretation" this Court presumes that the Legislature does not intend to overturn those established interpretations absent a clear intention to the contrary. *Id.* Despite multiple amendments to section 42-1102, including as recently as 2021, the Legislature has not overturned this Court's application of longstanding easement principles to the statutory right-of-way provided in section 42-1102. As such, we continue to interpret and apply the statute in accordance with those principles.

10

An easement consists of two parts: the primary easement and the secondary easement. *See Machado v. Ryan*, 153 Idaho 212, 221, 280 P.3d 715, 724 (2012). A primary easement encompasses the general definition of an easement—that is, the right to use another's land for some specific purpose. *Armand v. Opportunity Mgmt. Co.*, 155 Idaho 592, 600, 315 P.3d 245, 253 (2013). A secondary easement, in contrast, "refers to the right to enter and repair and do those things necessary to the full enjoyment of the [primary] easement." *Ruddy-Lamarca v. Dalton Gardens Irr. Dist.*, 153 Idaho 754, 757, 291 P.3d 437, 440 (2012). The exercise of secondary easement rights must always be reasonable. *Id.*

The plain language of section 42-1102 addresses both a ditch user's primary and secondary easements. Subsection (1) describes the right to use the land of another for a specified purpose—to convey water to its place of irrigation using a ditch, canal, or conduit. I.C. § 42-1102(1). Subsection (2), in turn, describes the secondary easement rights a ditch user has to maintain the right-of-way. I.C. § 42-1102(2). This distinction is more than a semantic one, as the character of an easement as primary or secondary informs how courts define the scope of the easement.

We have long required courts to define the scope of both primary and secondary easements when called upon to resolve conflicts between a servient estate holder and a dominant estate holder. *Ruddy-Lamarca*, 153 Idaho at 757, 291 P.3d at 440. With respect to a primary easement, any judgment determining the existence of an easement must specify the character, location, width, and length of the easement. *Argosy Trust ex rel. Andrews v. Wininger*, 141 Idaho 570, 572–73, 114 P.3d 128, 130–31 (2005); *see also Hall v. Taylor*, 57 Idaho 662, 668–69, 67 P.3d 901, 903 (1937). These dimensions, once ascertained, must be "definitely and certainly fixed and described in the decree" to allow parties with an interest in the dominant and servient estates to (1) know how the title to their real property has been affected and (2) avoid conflict. *Id.* Put simply, a judgment defining the scope of a primary easement must indicate the character, location, width, and length of the easement with sufficient detail so that it may be recorded against the servient estate.

In contrast, the scope of a secondary easement may vary based on the present circumstances affecting maintenance of the easement. *Ruddy-Lamarca*, 153 Idaho at 757–58, 291 P.3d at 440–41. A secondary easement is defined by what is reasonable to maintain the primary easement, and maintenance needs may change over time, so the scope of a secondary easement need not be fixed like a primary easement. *See id.* While some of our caselaw has suggested that the dimensions of a secondary easement may be fixed, we have not required such a result and have instead focused

11

on whether the exercise of a secondary easement right is reasonable under the circumstances. *Caldwell v. Cometto*, 151 Idaho 34, 38, 253 P.3d 708, 712 (2011) (affirming a three-foot secondary easement for snow removal from a right-of-way); *Ruddy-Lamarca*, 153 Idaho at 758, 291 P.3d at 441 (approving a sixteen-foot secondary easement for heavy equipment to replace irrigation conduit as opposed to an alternative method of replacement that would require forty-feet because "methods of pipeline installation that may have been reasonable fifty or sixty years ago are not necessarily reasonable today"). Secondary easements principally concern what maintenance activities an easement holder may conduct, and to the extent a secondary easement has a defined physical dimension, it is tethered to the amount of space reasonably necessary to accomplish a particular maintenance activity at that time. *See Ruddy-Lamarca*, 153 Idaho 758, 291 P.3d at 441.

With this framework in mind, we turn to the Hoods' contentions on appeal that the district court's decision conflicted with section 42-1102. The Hoods argue that the district court improperly restricted their secondary easement rights under section 42-1102 because: (1) the district court improperly denied them "the historic, reasonable access to the Hood ditch" and (2) the district court's decision improperly restricted the times when the Hoods can maintain the ditch and improperly imposed a notice required prior to such maintenance.

1. The district court's decision regarding the Hoods' unreasonable exercise of their right to access the ditch is supported by substantial and competent evidence, but the matter is remanded for the district court to apply the permanent injunction standard.

The Hoods argue that the limitation on access imposed by the district court is inconsistent with the "historic, reasonable access" to the ditch right-of-way for the last thirty years. Further, the Hoods argue that the access provided by the district court is inherently unreasonable because it is contingent on a variety of uncertain factors such as (1) the Poormans' northern neighbor allowing the Hoods access through their property, (2) reinstallation of the north culvert; and (3) the Hoods' construction of a ditch bank from their weir to their diversion.

Respondents argue that the district court's findings as to reasonable access are supported by substantial and competent evidence and are consistent with Idaho Code section 42-1102. Further, they contend that the district court's order did not leave the Hoods with only contingent access to the ditch.

Idaho Code section 42-1102 provides that the right-of-way for a ditch includes the "reasonable exercise of . . . [t]he right to enter the land across which the right-of-way extends for the purposes of accessing, inspecting, operating, cleaning, maintaining, and repairing the ditch[.]"

12

I.C. § 42-1102(2)(a).[3] We have construed the phrase "reasonable exercise" in section 42-1102 to mean that a ditch user's secondary easement rights are limited by the "rule of reasonableness." *Ruddy-Lamarca*, 153 Idaho at 757, 291 P.3d at 440.

Under the rule of reasonableness, "the servient estate owner is entitled to make uses of the property that do not unreasonably interfere with the dominant estate owner's enjoyment of the easement." *Id.* at 758, 291 P.3d at 441 (citing *Nampa & Meridian Irr. Dist. v. Wash. Fed. Sav.*, 135 Idaho 518, 522, 20 P.3d 702, 706 (2001)). Correspondingly, the dominant estate owner owes a "duty to minimize the impact of its enjoyment of the easement upon the servient estate." *Id.* As such, while a dominant estate owner "has the right to enter the servient estate in order to maintain, repair, or protect the easement . . . [he] may do so, however, only when necessary and in a reasonable manner as not to increase needlessly the burden on the servient estate." *Bedke v. Pickett Ranch & Sheep Co.*, 143 Idaho 36, 41, 137 P.3d 423, 428 (2006). "The question of reasonableness is ordinarily a question of fact to be resolved by the trier of fact after both parties have had an opportunity to try this issue." *Thiel v. Stradley*, 118 Idaho 86, 88, 794 P.2d 1142, 1144 (1990).

Here, the district court made a variety of factual findings concerning the Hoods' unreasonable exercise of their right to access the ditch. Although the Hoods preferred to use the access road to approach the ditch, the district court found that the ditch could not be maintained from the access road because it was too far away from the Hood ditch. Further, the district court made findings indicating that the Hoods repeatedly accessed the Poormans' property in an unreasonable manner, including accessing the Poormans' and Anderson's property far more often than other ditch users in the area, attempting to access the ditch through Anderson's personal driveway, accessing the ditch at night, and leaving equipment on the Poormans' property for months at a time. Additionally, the district court found that the Hoods had strayed up to 357 feet from the Hood ditch on the Poormans' property while taking pictures of the Poormans' and Anderson's properties, including their personal residences. The district court further found that the Hoods' "excessive access may be intended, in part, to harass the Poormans and Anderson."

The district court also made findings regarding a route that would provide reasonable access to the ditch on the Poormans' property. The district court found that the Hoods had used

---

[3] The language concerning a right to enter land for the purpose of accessing a ditch was added by a recent amendment to section 42-1102. 2021 IDAHO SESS. LAWS 778. The district court issued its decision prior to that amendment. However, neither party disputes that the current language in section 42-1102 controls this matter.

13

the ditch's banks to travel and conduct maintenance activities, and that the banks of the ditch allowed sufficient space for the Hoods to perform maintenance tasks with their preferred equipment like a bulldozer, ATV, or backhoe. Accordingly, the district court found that the Hoods' reasonable access was limited to traveling along the ditch and ditch banks, except on those portions of the Poormans' property where the ditch or banks were inaccessible due to topography or obstacles. In those areas, the district court found that the Hoods could reasonably use portions of the access road to navigate around the obstacles and regain access to the ditch or its banks.

As for the Hoods' diversion and weir at the north end of the Poormans' property, the district court found three alternative points of access. First, the district court found reasonable access along the access road between the north culvert and the Hood ditch diversion. Second, the district court found that the Hoods could also reasonably access their diversion from their weir if they constructed a ditch bank along that portion of the ditch. Third, the district court found that the Hoods could reasonably access their diversion directly from the north to the extent that the Poormans' northern neighbors continued to allow the Hoods to travel on their access road.

Neither party disputes that the language of section 42-1102 limits the Hoods to the reasonable exercise of their right to enter the Poormans' land; instead, they merely disagree as to whether the district court properly found the access points to be reasonable. Thus, the question is whether the district court's findings on this issue are supported by substantial and competent evidence, and whether those findings are consistent with section 42-1102.

To begin, we conclude that the district court's findings are supported by substantial and competent evidence. The district court relied on testimony from Keith Hood, Paul Poorman, the Poormans' expert witness, and Charles Edwards, the user of the Hood ditch for the twenty-five years preceding the Hoods, in finding that the Hoods had exercised their right to enter the Poormans' property unreasonably. Both Edwards and the Poormans' expert witness, Karson Craig, had extensive experience maintaining ditches in the local area, including performing maintenance work on the Hood ditch. The district court also relied on a video, shot by the Hoods, showing them traversing the ditch right-of-way on their ATV using the route the district court found to be reasonable. The video does not depict the Hoods traveling from their weir to the diversion. However, Keith Hood testified that the diversion and weir were accessible along the access road at the north of the Poormans' property. Further, Keith testified that he navigated that route using his dozer to clean vegetation from the ditch. Keith did not testify that the proposed route would be

14

impossible but stated that traveling the ditch from the south to maintain the weir or diversion would be extremely inconvenient. We therefore conclude that the district court's factual findings that: (1) the Hoods acted unreasonably in accessing the ditch; and (2) that there were alternative routes that provided reasonable access to the ditch are supported by substantial and competent evidence.

The district court erred, however, when it enjoined the Hoods from traveling outside what it found to be the reasonable access routes to the Hood ditch because it failed to apply the applicable injunction standard. A permanent injunction requires a showing of threatened or actual irreparable injury. *O'Boskey v. First Fed. Sav. & Loan Ass'n of Boise*, 112 Idaho 1002, 1007, 739 P.2d 301, 306 (1987). The district court's written order does not discuss or apply this standard prior to enjoining the Hoods from traveling outside the reasonable path of access that it identified. We therefore reverse that portion of the district court's order enjoining the Hoods from using access other than that declared by the district court, vacate its judgment regarding the same and remand the matter for the district court to apply the permanent injunction standard.

The Hoods make additional arguments on appeal related to that portion of the district court's order identifying alternative routes to access the ditch, which we will address for purposes of providing guidance for this issue on remand. "Where an appellate court reverses or vacates a judgment upon an issue properly raised, and remands for further proceedings, it may give guidance for other issues on remand." *North Idaho Building Contractors Assoc. v. City of Hayden*, 164 Idaho 530, 540, 432 P.3d 976, 986 (2018) (quoting *Urrutia v. Blaine Cnty.*, 134 Idaho 353, 359, 2 P.3d 738, 744 (2000). "In offering guidance, however, we are aware that such guidance should only be given on issues that are absolutely necessary, and regarding issues that have a practical effect on *this appeal*; otherwise, we would be offering an impermissible advisory opinion cloaked as 'guidance.'" *Id.* (citing *State v. Manzanares*, 152 Idaho 410, 419, 272 P.3d 382, 391 (2012)).

The Hoods first contend, relying exclusively on section 42-1102, that the district court erred in denying them the "historic, reasonable access" to the ditch along the access road. However, section 42-1102 does not entitle a ditch user to the "historic" access to the ditch. Nor does it entitle a ditch user to their preferred access if they utilize that access in an unreasonable manner. Here, a reasonable factfinder could, as the district court did, conclude that the Hoods had unreasonably exercised their right to access the ditch and that reasonable, alternative access routes exist that will allow the Hoods to access the ditch while limiting the burden on the Poormans' property. In the event the district court concludes that threatened or actual irreparable harm will result if the Hoods

15

are not restricted to the reasonable alternative access routes, nothing in section 42-1102 prevents the district court from granting the Poormans injunctive relief in that regard.

Second, the Hoods argue that the access ordered by the district court is uncertain because it hinges on the Poormans' northern neighbor allowing them to cross his property. Yet, the access that the district court identified is not dependent on the Hoods being able to cross the neighboring property. While the district court pointed out that the Hoods *could* access the right-of-way from the north via the neighboring property, it also provided for access to the entire course of the ditch from the south. As such, even if the neighbor closed his property to the Hoods, the Hoods would still be able to access the right-of-way using the other access identified by the district court.

Third, the Hoods argue that the district court made their access to their weir and diversion contingent on the reinstallation of the north culvert. Since they argue the district court erred in ordering the culverts to be reinstalled, they contend it was also an error to make access contingent on their reinstallation. This argument ignores the language of the district court's order, which indicated that the Hoods' reasonable point of access to their diversion would be to use the established access road from "the location where the northern culvert *was removed*[.]" (Emphasis added). Indeed, the Hoods' video exhibit, relied on by the district court in reaching its conclusion, shows the Hoods traveling south from their weir along the ditch banks and crossing the ditch near where the north culvert was removed. Thus, even if the north culvert were not reinstalled, the access provided for by the district court's order would still be sufficient to allow the Hoods to reach both their weir and diversion.

Finally, the Hoods argue that the district court made access to their diversion from the weir contingent on the Hoods clearing vegetation and building a ditch bank. However, this access is merely an alternative to the previously discussed access from the south. Without a ditch bank from the weir to the diversion, the district court concluded that the Hoods could use the ditch banks and established an access road to travel to and from the weir and diversion. Even if the Hoods chose to never clear a path between their weir and diversion, the district court's order still provides them with reasonable access to both of those points.

To conclude, nothing in section 42-1102 guaranteed the Hoods the "historic, reasonable access" to the ditch. The district court's findings that the Hoods unreasonably exercised their right to enter the Poormans' property to access the ditch and findings as to where and how the Hoods may reasonably access the ditch are supported by substantial and competent evidence. We

16

therefore affirm the district court's decision on these points. We, however, reverse that portion of the district court's order enjoining the Hoods from using access other than described in the district court's order, vacate its judgment regarding the same and remand the matter for proceedings consistent with this opinion.

2. The district court erred in imposing certain limitations on the Hoods' maintenance activities.

The Hoods argue that the district court's restrictions as to when they may access their ditch right-of-way impermissibly interfered with their rights under section 42-1102. Specifically, they contend that the district court erred in limiting them to one week of maintenance in March and September; requiring them to provide seventy-two hours of notice and obtain permission to conduct additional maintenance; and restricting their ability to respond to any emergencies with the ditch. They assert that section 42-1102 gives them the right to access the right-of-way when they determine it is "necessary to clean, maintain, or repair the Hood ditch," and the district court's restrictions prevent them from fulfilling their obligations, imposed by other Idaho statutes, to maintain the ditch, exposing them to potential liability.

The Poormans and Anderson first contend that by failing to address the district court's remaining restrictions, the Hoods have waived their arguments related to (1) accessing the right-of-way at night absent an emergency; (2) accessing the right-of-way when water is not in the ditch between Thanksgiving and February; and (3) leaving their equipment in the right-of-way for more than twenty-four hours. Addressing the merits of the restrictions, they argue that the district court did not abuse its discretion in enjoining the Hoods from accessing the right-of-way during certain times because the district court's conclusion that irreparable injury would occur absent an injunction is supported by substantial and competent evidence. They also assert that the restrictions placed on the Hoods do not prevent them from exercising their statutory maintenance rights.

After considering the evidence at trial, which included the testimony of Edwards and Craig, the district court found that the Hoods had accessed their ditch right-of-way unreasonably because they exceeded the prevailing practice in the surrounding area and their intrusions were primarily done to harass the Poormans and Anderson. The Hoods accessed the ditch daily or every other day when water was in the ditch in contrast to the practice of other local farmers who, on average, only visited their ditches once a week when water was flowing. Further, the Hoods accessed the right-of-way at night, even when there was no emergency.

17

The district court found that Edwards did not visit the ditch between Thanksgiving and April or May of each year, the period when water was not flowing in the ditch. In contrast, the district court found that when there was no water flowing in the ditch the Hoods accessed Respondents' properties eight-to-ten times with only a camera and no maintenance tools. The district court also found that the Hoods had taken hundreds of photos and videos of Respondents and their properties from the right-of-way.

Regarding when maintenance work was completed, the district court found that it was customary in the local area to clean a ditch once every three to five years. It also found that such maintenance was usually performed in the fall with hand tools. In contrast, the Hoods used two pieces of heavy equipment—a dozer and a backhoe—as well as various hand tools to perform maintenance. The Hoods cleared vegetation from the ditch and banks once a year by dragging a chain harrow[4] behind their dozer. They also left heavy equipment on the Poormans' property for months at a time. Finally, the district court found that Keith Hood stated, "he would do whatever he could to run the Poormans off."

Based on the above, the district court found the Hoods' "frequency of travel" along the right-of-way to be unreasonable and concluded that irreparable harm would occur in the form of harassment and damage to the natural habitat without an injunction. Consequently, the district court limited the Hoods use of the right of way to the following:

- The Hoods can only access the Hood ditch once per week when water is in the ditch.

- The weekly access is for the limited purpose of cleaning, maintaining, and repairing the ditch.

- The Hoods may not use the weekly access to "simply travel along the Poormans' and Anderson's properties without completing work along the Hood ditch."

- The Hoods may access the ditch if notified of an emergency in writing by the Anderson or the Poormans, or notified by a government agent.

- When there is not water in the ditch, the Hoods may not access the ditch between Thanksgiving and February.

- The Hoods may access their ditch for one week in September and one week in March for cleaning, maintenance, and repairs.

---

[4] A chain harrow is "a cultivating tool set with spikes, teeth, or disks . . . used primarily for breaking up and smoothing . . . soil." *Harrow*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/harrow (last visited April 7, 2022).

- The Hoods can access the ditch more frequently if they provide seventy-two hours' notice and the Poormans and Anderson agree in writing.
- The Hoods may not access the Hood ditch at night unless notified of an emergency by the Poormans, Anderson, or a government agent.
- The Hoods may not leave equipment in the right-of-way for more than twenty-four hours except during the one-week spring and fall maintenance blocks.

On appeal, the Hoods do not challenge the district court's factual findings, but instead assert that the district court's injunctive relief was unreasonable and unlawful because it conflicted with section 42-1102. A district court's decision granting injunctive relief is reviewed for an abuse of discretion. *Gem State Roofing, Inc. v. United Components, Inc.*, 168 Idaho 820, 828, 488 P.3d 488, 496 (2021). The Hoods do not discuss the abuse of discretion standard in their briefing to this Court. However, to the extent the Hoods argue that the district court's injunctive relief was inconsistent with applicable legal standards and unreasonable, we construe their argument as asserting that the district court abused its discretion in violation of the third and fourth *Lunneborg* factors. *See Valiant Idaho, LLC v. JV L.L.C.*, 164 Idaho 280, 291, 429 P.3d 168, 179 (2018) (A party claiming an abuse of discretion bears the burden to demonstrate violation of "at least one part of the abuse of discretion test."). Before we address the merits of the Hoods' argument, we first consider whether the Hoods waived their arguments regarding certain portions of the district court's order.

   a. *The Hoods have waived their arguments with respect to portions of the district court's injunctive relief.*

Respondents contend that the Hoods have waived their arguments on appeal relating to: (1) accessing the ditch right-of-way at nighttime; (2) accessing the ditch right-of-way when water is not in the ditch between Thanksgiving and February; and (3) leaving equipment in the right of way for more than twenty-four hours because they have not provided specific argument on these issues. The Hoods do not counter this argument in their reply brief.

Idaho Appellate Rule 35 requires an appellant's brief to "contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon." I.A.R. 35(a)(5). "Issues that are not argued and supported as required by the appellate Rules are deemed to have been waived." *Sherman Storage, LLC v. Global Signal Acquisitions II, LLC*, 159 Idaho 331, 338–39, 360 P.3d 340, 347–48 (2015) (citation omitted).

We conclude that the Hoods have waived their challenge to these issues. While the Hoods generally assert that section 42-1102 prevents a trial court from imposing any limits on their secondary easement rights, they only provide specific arguments relating to the one-week maintenance periods in March and September, their ability to maintain the ditch in event of an emergency, and the requirement to obtain written agreement after seventy-two hours of notice to conduct maintenance activities in excess of the district court's schedule. Accordingly, we conclude that the Hoods have waived any challenge to the other restrictions identified in the district court's order.

> b. *The district court abused its discretion in enjoining the Hoods from accessing the ditch right-of-way at certain times.*

Turning to the restrictions that the Hoods addressed in their briefing, the Hoods assert that the district court erred in limiting their use of the right-of-way because its decision was (1) inconsistent with Idaho Code section 42-1102 and (2) unreasonable. The first two *Lunneborg* elements are not in dispute. As such, we address only whether the district court acted consistently with governing legal standards and through the exercise of reason.

To begin, the Hoods do not assert that the district court failed to meet the applicable standard for issuing a permanent injunction, but rather rest their argument on the contention that section 42-1102 does not permit timing or notice restrictions on a ditch user's maintenance activities. Section 42-1102 provides:

> The right-of-way for a ditch . . . shall include but is not limited to the *reasonable exercise* of . . . [t]he *right to occupy the right-of-way during any season of the year* to perform the work of operating, cleaning, maintaining and repairing the ditch . . . *without prior notice to the owner or occupant of the land* across which the right of way extends.

I.C. § 42-1102(2)(c) (emphasis added). Nothing in the statute permits a ditch user unfettered exercise of the statutory rights. As discussed above, the statutory language incorporates the rule of reasonableness. Thus, a prerequisite to limiting a ditch user's exercise of secondary easement rights is a finding that the ditch user has exercised such rights unreasonably and needlessly burdened the servient estate. *Bedke*, 143 Idaho at 41, 137 P.3d at 428. In addition, prior to entering injunctive relief a court must also determine that threatened or actual irreparable harm would result if the ditch user were not enjoined from exercising their rights unreasonably. *See Gem State Roofing, Inc.*, 168 Idaho at 834, 488 P.3d at 502 (discussing the standard for a permanent injunction).

20

Here, the district court rejected the Hoods' argument that section 42-1102(2)(c) allowed them to access the right-of-way at any time they determined it was necessary to clean, maintain, or repair the Hood ditch, concluding that the Hoods were only entitled to the reasonable exercise of those rights. The district court then applied the rule of reasonableness to assess whether the Hoods had reasonably exercised their rights. It found that the Hoods had accessed the right-of-way excessively, almost every day and sometimes at night, with the intention to harass the Respondents. Further, the district court noted that the Hoods had not presented any evidence that such excessive occupation of the right of way was related to a permissible purpose under section 42-1102. Rather, the district court noted the prevailing practice in the local area was to access ditches once a week when water is running and to clean the ditches in the fall after irrigation season has ended. The district court also found that if it did not limit the Hoods' access, irreparable harm would result in the form of harassment and damage to the natural habitat of the servient estate. Accordingly, the district court concluded that the Hoods had unreasonably exercised their rights and that irreparable harm would occur without a ruling limiting the Hoods' use.

We conclude that the district court acted consistently with applicable legal standards and through the exercise of reason in determining that the Hoods needed to be enjoined from unreasonably accessing the ditch. Contrary to the Hoods' assertions, their secondary easement rights under section 42-1102 are not unfettered. As previously discussed, they may be limited if they are exercised unreasonably and a court determines that an injunction is proper to prevent threatened or actual irreparable injury to the servient estate. The Hoods have not challenged the district court's factual findings that they accessed the ditch far more than the local practice, and that they did so with the purpose of harassing the Respondents. Further, they do not challenge the district court's conclusion that irreparable harm would result if the Hoods were not enjoined from excessively occupying the right-of-way. As such, the district court acted consistently with applicable legal standards in concluding that the Hoods needed to be enjoined to prevent irreparable injury to the servient estate. Further, given the district court's undisputed findings that the Hoods had acted with the intention of harassing and "running off" the Poormans and Anderson, the district court also exercised reason in concluding an injunction would be appropriate.

Although the district court did not abuse its discretion in choosing to enjoin the Hoods from excessively accessing the right-of-way, some of the district court's specific limitations on when the Hoods could access the right-of-way were an abuse of discretion because they were either

21

unsupported by evidence in the record or contradicted by the evidence presented at trial. First, the district court failed to exercise reason in enjoining the Hoods from conducting emergency ditch maintenance unless notified by Respondents or a government agent. There was no evidence that the Hoods had abused their right to access the right-of-way by claiming a non-existent emergency existed with the ditch. We note that ditch users are subject to statutory duties to maintain their ditches and prevent harm to others. *See* I.C. §§ 42-1203, -1204. The district court's limitation could prevent the Hoods from timely responding to an emergency with the ditch, potentially exposing them to liability. If a breach of the ditch bank or other emergency occurred while either Anderson or the Poormans were away from their property, the Hoods would be unable to respond absent a notification from some government agent, even though they may be aware of an emergency simply by observing the flow of water in the ditch on their own property. Accordingly, we conclude that the district court abused its discretion in enjoining the Hoods from conducting emergency maintenance absent a notification from Anderson, the Poormans, or a government agent because it did not exercise reason in imposing this limitation. If, however, the Hoods begin abusing the right to access the right-of-way for purported emergency repairs, then the Poormans and/or Anderson can present that evidence and the district court can determine whether further injunctive relief is necessary.

Next, the district court abused its discretion in limiting the Hoods to conducting maintenance to one week in March and one week in September. Other than a finding that maintenance was preferable in the fall, the district court made no finding about spring maintenance. The Hoods' agricultural irrigation season runs from March 15 to October 31 of each year. While it is likely that any spring maintenance would occur prior to March 15 when the Hoods can begin diverting water, the Hoods also pointed out that there is often snow on the ground at that time of year, which could delay diversion and maintenance activities. Thus, the district court did not exercise reason in enjoining the Hoods' pre-irrigation season maintenance activities to one week in March because that restriction does not adequately account for the varying conditions that may affect the timing of pre-season maintenance on the ditch. As for fall maintenance, the Hoods' irrigation season does not end until October 31. The Hoods' water rights are usually curtailed beginning in late July or early August. As such, the Hoods' irrigation season typically lasts three to four months every year. Like its restriction on spring maintenance, the district court did not exercise reason in limiting the Hoods' post-season activities to one week in September because it

22

did not account for the range of end dates for the Hoods' irrigation season, which could occur as early as late July and possibly as late as the end of October.

Finally, we need not address whether the district court abused its discretion in requiring the Hoods to provide seventy-two hours' notice and to obtain an agreement in writing prior to conducting non-emergency maintenance in excess of the time allowed in the district court's order because the subsequent amendment to section 42-1102 necessitates reconsideration of that relief. At the time the district court issued its decision, section 42-1102 did not contain language regarding notice. 2021 Idaho Sess. Law 778. However, the statute now provides that a ditch user has "[t]he right to occupy the right-of-way during any season of the year to perform the work of operating, cleaning, maintaining, and repairing the ditch . . . *without prior notice to the owner or occupant of the land across which the right-of-way extends*." I.C. § 42-1102(2)(c) (emphasis added). Given our decision reversing and vacating other aspects of the district court's order and judgment, we also reverse and vacate that portion of the district court's order and judgment requiring the Hoods to provide notice in advance of conducting additional maintenance so it can consider this issue in light of the new statutory language. We note, however, that the new statutory language is subject to the same "rule of reasonableness" as the other secondary easement rights set out in section 42-1102(2) and therefore the district court may impose injunctive relief if the district court finds that the Hoods were unreasonable in their exercise of the right, and finds that threatened or actual irreparable harm would result if it did not impose limitations on the Hoods' exercise of the right.

**B.  The Hoods improperly removed the north and south culverts.**

The Hoods argue that the district court erred in concluding that they had improperly removed the north and south culverts because it applied the wrong statute in its analysis. They argue that the district court incorrectly applied section 42-1102 because the governing statute is Idaho Code section 42-1207. Under section 42-1207, they contend that a ditch user's written permission is a prerequisite for burying any ditch in any length of pipe.

Respondents contend that the district court applied the correct statute because section 42-1102 governs when a ditch user may have an encroachment removed. Thus, they explain that even if the district court should have applied section 42-1207 to determine if the culvert was lawfully installed in the ditch, section 42-1102 would nonetheless govern the Hoods' ability to remove the culverts. Additionally, Respondents argue that that even if the district court erred in applying

section 42-1102, the clean hands doctrine should prevent the Hoods from obtaining relief because their conduct in removing the culverts was inequitable and unfair.

The district court found that the south culvert was installed in 2002 or 2003. It could not determine when the north culvert was installed, but found it was in place when the Poormans purchased their property in 2006. In analyzing whether the Hoods improperly removed the culverts, the district court applied the common law to the south culvert because its installation predated language in section 42-1102 regulating the installation and removal of encroachments. Prior to the addition of that language in section 42-1102, a ditch owner bore the burden of demonstrating that an encroachment unreasonably interfered with their right-of-way before an encroachment could be removed. *Morgan*, 156 Idaho at 256, 322 P.3d at 989. The district court concluded that the Hoods had presented no evidence that the south culvert interfered with the flow of water in the Hood ditch and that other similar-sized culverts did not cause any problems and the Hoods did not remove them. Further, it pointed out that the Hoods had placed a culvert of the same size in their ditch at the diversion point, which supported its conclusion that the south culvert did not impede water flow in the ditch. Finally, the district court noted that the Hoods had used the culverts for four years prior to removing them. Accordingly, the district court concluded that the Hoods had not met their burden to show that removal of the south culvert was justified because it unreasonably interfered with their right-of-way.

With respect to the north culvert, the district court applied section 42-1102 because it could not determine if that culvert had been placed before or after the effective date of the statute and therefore decided to apply the more restrictive provision. To remove an encroachment under that statute, the district court determined that a ditch user must show (1) the encroachment was placed after the effective date, (2) the encroachment was placed without permission, and (3) the encroachment unreasonably or materially interfered with the use and enjoyment of the right-of-way. The district court reasoned that the Hoods had not demonstrated that the north culvert was placed without permission as it predated the Hoods' purchase of their property and there was no testimony as to whether the previous landowner gave consent. Further, like the south culvert, the district court concluded that the Hoods had not presented any evidence that the north culvert materially or unreasonably interfered with their right-of-way. Accordingly, the district court determined that the Hoods had failed to meet their burden to justify removal of the north culvert.

24

Finally, the district court concluded that the Hoods' actions in removing both culverts unreasonably increased the burden on the servient estate by cutting off access to 200 acres of the Poormans' property and leading the Hoods to create new roads on the Poormans' property to access the ditch. Accordingly, the district court concluded that the Poormans were entitled to damages for the cost to reinstall the culverts. Further, the district court enjoined the Hoods from removing the culvert beneath the Poormans' driveway, reasoning that the Hoods had not carried their burden to demonstrate that the culvert unreasonably or materially interfered with their right-of-way.

We begin with a review of the two statutes at issue. Section 42-1102(5) prohibits the placement of any encroachment, including pipelines, in a right-of-way without the written permission of the owner or operator of the right-of-way. It also provides for removal of encroachments placed in violation of the statute. *Id.* This Court has interpreted section 42-1102 to require a servient landowner to remove an encroachment at the request of the ditch user if it was (1) constructed after 2004, (2) constructed without permission, and (3) "interferes unreasonably or materially with the use and enjoyment of the easement." *Morgan v. New Sweden Irr. Dist.*, 156 Idaho 247, 255, 322 P.3d 980, 988 (2014).

Section 42-1207 permits a landowner to bury a ditch on his property, provided he first obtains the written permission of the ditch owner or operator. Section 42-1207 "protects a dominant estate owner from injuries relating to an impediment to water flow, as well as any other injuries suffered by the dominant estate owner as a result of the servient estate owner's interference with the ditch." *Bratton v. Scott*, 150 Idaho 530, 540, 248 P.3d 1265, 1275 (2011). To demonstrate a violation of the statute, there must be an injury that is more than a "minor increase in the length of a ditch or other conditions which negligibly increase its maintenance." *Id.* at 540–41, 248 P.3d at 1275–76; *see also Statewide Const., Inc. v. Pietri*, 150 Idaho 423, 431, 247 P.3d 650, 658 (2011) ("A mere increase in length or maintenance for an appurtenance does not constitute an injury under I.C. § 42–1207, but where the appurtenance holders' ability to obtain water—or their historical flow-rate of water—is restricted, this Court will find that an injury has occurred.") *abrogated in part on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 265 P.3d 502 (2011). Nothing in section 42-1207 discusses removal of a pipe installed without the written permission of the landowner.

25

There is no dispute here that a culvert is a pipe that is both placed in a ditch and buried under ground. We must therefore reconcile the language in section 42-1102 with the language in section 42-1207 to determine which governs here. When interpreting statutes, this Court begins with the literal words of the enactment. *City of Idaho Falls v. H-K Contractors, Inc.*, 163 Idaho 579, 582, 416 P.3d 951, 954 (2018). Further, "[w]here two statutes apply to the same subject matter they are to be construed consistent with one another where possible, otherwise the more specific statute will govern." *Huyett v. Idaho State Univ.*, 140 Idaho 904, 908, 104 P.3d 946, 951 (2004).

After reviewing the plain language of both statutes, we hold that section 42-1207 governs the placement of a culvert in a ditch because it is the more specific statute. While section 42-1102 specifically identifies a "pipeline" as a type of encroachment, that term also generally refers to pipes carrying other substances that cross a ditch. In contrast, section 42-1207 deals more specifically with the type of pipeline at issue here--burying part of a ditch by placing a culvert in the ditch. In short, placing a pipeline in a ditch is different than burying a ditch in a pipe. Section 42-1207 more specifically addresses the situation in this case, and, as such, is the controlling statute with respect to whether removal of the culverts was appropriate.

Notwithstanding the district court's error, we affirm its ruling that removal of the culverts was inappropriate because the Hoods failed to establish a violation of section 42-1207 and elected to pursue a remedy unavailable to them under that statute. On the first point, the Hoods have not challenged the district court's factual findings that the culverts did not interfere with the flow of water through the ditch, nor have they argued that the culverts' presence increased maintenance costs. The Hoods also did not present any evidence that the culverts were placed without the written permission of the previous landowner. Thus, the Hoods have not made a showing that would entitle them to *any* relief under section 42-1207. *See Statewide Const., Inc.*, 150 Idaho at 431, 247 P.3d at 658. On the second point, the appropriate recourse for a violation of section 42-1207 is to seek damages or an injunction to return the ditch to its original state. *See Bratton*, 150 Idaho at 539–40 (discussing damages awards under the statute); *Savage Lateral Ditch Users Ass'n v. Pulley*, 125 Idaho 237, 242–44, 869 P.2d 554, 559–61 (1993) (discussing the availability of injunctive relief). Nothing in the statute or our caselaw indicates resorting to self-help by removing a preexisting culvert is an appropriate form of relief under section 42-1207. Accordingly, we affirm the district court's order permitting the Poormans to reinstall culverts. Since we affirm the

26

conclusion that the Hoods improperly removed the culverts, we do not address Respondents' arguments about the doctrine of unclean hands.

**C. The district court's damages award is affirmed in part and reversed in part.**

The Hoods argue that the district court erred when it awarded the Poormans $1800 for the reinstallation of the north and south culverts and $250 for the removal of a mature apple tree within the right-of-way. They argue that the damage award for reinstallation of the culverts was inappropriate because the culverts were properly removed. As for the apple tree, they contend that they should not be responsible for damages for its removal because it was within the right-of-way.

As discussed above, the district court did not err in concluding that the Hoods improperly removed the culverts and ordering their reinstallation. As such, we affirm the district court's damage award relating to the reinstallation costs.

However, as concerns the damages awarded for the removal of the apple tree, we reverse. Importantly, the district court found that the apple tree was within the right-of-way for the ditch, a finding the Poormans do not challenge on appeal. The district court awarded damages for the removed apple tree based on a negligence theory. It is unclear from the district court's order whether it looked to Idaho Code sections 42-1102 or 42-1204 in defining the duty the Hoods breached by removing the tree. Section 42-1102 provides that a ditch user must keep their ditch "in good repair and are liable to the owners or claimants of lands crossed by such work . . . for all damages occasioned by the overflow thereof, or resulting from any neglect or accident . . . to such ditch." I.C. § 42-1102(3). Section 42-1204, in turn, states that ditch users must exercise ordinary care to maintain ditches "in good repair and condition, so as not to damage or in any way injure the property or premises of others." I.C. § 42-1204. We need not resolve which statute would be the correct one to apply in this instance because the district court's conclusion with respect to removing the apple tree improperly placed the burden of proof on the Hoods, and its findings are insufficient to justify a damage award.

With respect to the apple tree, the district court reasoned that the "Hoods were unable to provide any expert testimony that its roots were in fact damaging or causing the Hood ditch to leak or seep." The district court then concluded that the Poormans were entitled to damages for the tree because "it was unreasonable for the Hoods to remove the apple tree." It is axiomatic that a claimant bears the burden of proof on the elements of their negligence claim. *See*, *e.g.*, *Gagnon v. W. Bldg. Maint., Inc.*, 155 Idaho 112, 115, 306 P.3d 197, 200 (2013). Here, it was the Poormans

27

who raised a negligence counterclaim seeking damages for the removal of the apple tree. Therefore, the Poormans bore the burden of proof to demonstrate all the elements of their negligence claim, and the district court erred in not analyzing whether they carried that burden. Accordingly, we reverse that portion of the district court's decision awarding $250 to the Poormans for the apple tree.

**D. The form of the district court's judgment was in error.**

We also provide the following guidance on remand concerning the form of the district court's judgment. *See Software Assocs., Inc. v. State, Dep't of Emp.*, 110 Idaho 315, 317, 715 P.2d 985, 987 (1986) (citing I.C. § 1-205). The district court's amended judgment provided declaratory, injunctive, and monetary relief and stated that all relief "shall run with the parties' lands and shall be binding upon their respective successors in interest in the real property, water rights, and right-of-way." The district court erred in this regard. While a judgment defining an easement is fixed and is an interest in real property that runs with the land, the injunctive and declaratory relief imposed by the district court were based on the specific conduct of the Hoods and therefore do not run with the land or bind the Hoods' successors-in-interest.

As previously discussed, a judgment defining a primary easement must definitely fix the dimensions of the primary easement and describe them with certainty in the decree so that the dominant and servient estate owners (and their successors) know how their real property is affected. *See Argosy*, 141 Idaho at 572–73, 114 P.3d at 130–31. When the existence and scope of an easement (or right-of-way) is declared, parties have the expectation that they may record that judgment. In short, a judgment defining the scope of a primary easement necessarily runs with the land because the dimensions of that easement are fixed in space and time.

In contrast, a secondary easement is defined in relationship to a particular easement holder conducting maintenance activities at a given time, thus the proper form of relief is an injunction to prevent the ditch user from engaging in maintenance activities that unreasonably burden the servient estate. *See* JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS & LICENSES IN LAND § 8:17 (2022); *see Conley v. Whittlesey*, 133 Idaho 265, 270–73, 985 P.2d 1127, 1132–35 (1999). Injunctive relief only binds the parties being enjoined, compelling them to take or refrain from taking some action. *Injunction*, BLACK'S LAW DICTIONARY (11th ed. 2019) (""[A]n injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing.").

28

The district court's declaratory relief, defining the points of access that the Hoods may use to access the right-of-way, was similarly based on the Hoods' conduct and, therefore, the relief granted is personal to the Hoods. Therefore, neither the injunctive relief nor the declaratory relief should run with the land.

On remand, the district court should issue two judgments. One judgment defining the purpose, length, width, and location of the primary easement—that is, the physical dimensions of the Hood ditch, and that the easement is for an irrigation ditch. This judgment will run with the land and bind the parties' successors-in-interest. The second judgment should identify the injunctive relief limiting the Hoods' exercise of their secondary easement rights and include the declaratory and monetary relief awarded. The second judgment will not run with the land or bind the Hoods' successors-in-interest. If the Hoods' successors-in-interest unreasonably exercise their secondary easement rights, the servient estate holder would need to pursue a new legal action to obtain injunctive relief based on the conduct of the successor owner(s).

## V. CONCLUSION

For the above reasons we affirm in part, reverse in part, and remand this matter to the district court. Because both parties prevailed in part, there is no overall prevailing party; thus, no costs are awarded on appeal.

Chief Justice BEVAN and Justices BRODY, STEGNER, and MOELLER **CONCUR.**